**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CECILIA LUNA-DIAZ, Administratrix
*Ad Prosequendum* of the Estate of ELVIN DIAZ,
deceased, *et al.*,

      Plaintiffs,

      v.

CITY OF HACKENSACK POLICE
DEPARTMENT, *et al.*,

      Defendants.

Civil Action No. 16-3270 (EP) (JSA)

**OPINION**

**PADIN**, **District Judge.**

On May 21, 2015, Hackensack Police Department ("HPD") officers entered the home of Elvin Diaz to see why Elvin[1] had not checked in with his probation officer. The HPD officers' encounter with Elvin, whom they knew to have schizoaffective disorder and previous violent encounters with HPD, ended when HPD officers shot and killed Elvin in his kitchen as he held a meat cleaver. Plaintiffs—Elvin's estate and immediate family members—sued Hackensack, HPD, and individual HPD officers for state and federal civil rights violations and related tort claims. Plaintiffs now move for partial summary judgment on liability, and all Defendants move for summary judgment dismissing Plaintiffs' complaint, including arguments that certain Defendants' liability is precluded by qualified immunity. For the reasons below, the Court will **DENY** Plaintiffs' motion and **GRANT IN PART** and **DENY IN PART** Defendants' motion.

---

[1] Because several parties share a last name, the Court refers to Elvin and Plaintiffs by their first names.

# Table of Contents

I.     BACKGROUND ..................................................................................................... 3

   A.    The Parties ...................................................................................................... 3

   B.    The House ....................................................................................................... 4

   C.    Probation Officer ("P.O.") Havens calls Officer Luther about Elvin's missed probation appointments ................................................................................................. 6

   D.    HPD Officers respond to the welfare check request and arrive at Elvin's home ........... 7

   E.    Sergeant Molina arrives first ..................................................................................... 7

   F.    Officer Hernandez arrives shortly after Sergeant Molina ................................................. 8

   G.    Officers encounter Kelvi and Elvin ....................................................................... 9

   H.    This action ..................................................................................................... 12

II.    SUMMARY JUDGMENT STANDARD ......................................................................... 14

III.   DISCUSSION ..................................................................................................... 15

   A.    Counts I, II, III, IV, V, VI, and VIII: state and federal civil rights claims 42 U.S.C. § 1983 and N.J.S.A. 10:6-1 (the New Jersey Civil Rights Act ("NJCRA")) ................. 15

       1.    The claims will be considered together as Fourth Amendment claims ....................... 16

       2.    There are three distinct Fourth Amendment claims .................................................... 17

       3.    Qualified immunity ............................................................................................. 19

   B.    Plaintiffs' municipal liability (*Monell*) claims – Counts II and XIII ............................ 35

   C.    Plaintiffs' *respondeat superior* claim (Count XIII) will not be dismissed ................... 38

   D.    Plaintiffs' state improper detention claims (Counts VI and VII) are dismissed ........... 39

   E.    Plaintiffs withdraw their conspiracy claim (Count XII). ................................................. 39

   F.    Defendants are entitled to summary judgment on Plaintiffs' negligence claim (Counts XI and XIV) based on insufficient evidence that Officer Luther was negligent .......... 39

   G.    Negligent Infliction of Emotional Distress claim ("NIED," Count IX) ....................... 40

   H.    Intentional Infliction of Emotional Distress ("IIED," Count X) .................................... 42

IV.   CONCLUSION ..................................................................................................... 42

I.   **BACKGROUND**[2]

Unless otherwise noted, all of the relevant events took place on May 21, 2015.

A.  **The Parties**

Plaintiffs are Elvin's immediate family members: Cecilia Luna-Diaz his mother and estate administrator, Kelvi Diaz his brother, and Julian Diaz his father (and Cecilia's ex-husband). Defendants are the City of Hackensack ("Hackensack"), the HPD, HPD Police Officer James Luther,[3] HPD Sergeant Miguel Molina, and HPD Police Officer Elvin Hernandez.

HPD Officer Gaetano Gallorini was also at the scene during the shooting.  HPD Sergeant Francesco Tripodi was at the scene after the shooting.

---

[2] The Court relies upon the following documents and the exhibits they cite, noting relevant factual disputes where they exist.  Page references are to the CM/ECF auto-pagination in the docket entry headers.

- "Pls. Facts" - Plaintiffs' Statement of Facts accompanying its motion. D.E. 122-1.
- "Defs. Resp. Facts" - Defendants' Joint Responses to Plaintiffs' Statement of Undisputed Material Facts.  D.E. 123-2.
- "Defs. Counter Facts" - Defendants' Joint Counter Statement of Material Facts (D.E. 123-1) to Plaintiffs' Motion for Summary Judgment.  D.E. 122.
- "Defs. Facts" - Defendants' Joint Statement of Material Facts in Support of Defendants' Joint Motion for Summary Judgment.  D.E. 125-2.  This document expands upon Defs. Counter Facts.
- "Pls. Resp. Facts" - Plaintiffs' Responsive Statement of Facts.  D.E. 126-2.
- "Pls. Supp. Facts" - Plaintiffs' Supplemental Statement of Facts in response to Defendants' Statement of Material Facts.  D.E. 126-1.
- "Defs. Reply Facts" - Defendants' Joint Responses to Pls. Supp. Facts.  D.E. 127-2.
- "Pls. Mot." - Plaintiffs' memorandum of law in support of summary judgment.  D.E. 122-2.
- "Defs. Mot." - Defendants' joint brief in support of summary judgment.  D.E. 125-3.
- "Pls. Opp'n." - Plaintiffs' brief opposing Defendants' summary judgment motion.  D.E. 126.
- "Defs. Reply" - Defendants' reply brief.  D.E. 127.
- "Dep." - Pre-trial depositions (*e.g.* Santa Dep. refers to Maria Santa pre-trial deposition). Citations to depositions reference the transcript page numbers.

[3] Where this Opinion references "Officer Defendants," that designation does not reference Officer Luther, who was not at the House during the relevant events.

**B.  The House**

Most of the relevant events occurred at 10 Temple Avenue, Hackensack, New Jersey, where Elvin lived with his family (the "House").  Pls. Supp. Facts ¶ 4.  The House was a two-story (plus basement) multifamily home with two separate entries:



Door 2, depicted on the right in an alcove ("Santa's Door"), leads to neighbor Maria Santa's separate first-floor apartment.[4]  Door 1, on the left, (the "Front Door") leads to a hallway with doors to the basement and Santa's apartment[5] and a staircase to the second floor, where there were three bedrooms and the kitchen where police shot Elvin:[6]

---

[4] Pls. Ex. H., D.E. 122-1 at 224 (Plaintiffs' annotation).  Though it is unclear when the photos attached to the motions and used here were taken, Defendants do not dispute that the photos accurately represent the House's general layout on May 21, 2015.  Defendants' photos depict the same layout.  *See, e.g.*, D.E. 125-20 at 19, *et seq.* (Defs. Exs. QQ-RR).

[5] The door to Santa's apartment was always locked from the hallway side.  Santa Dep. 44:10-20.  Santa did not have the key.  *Id.*

[6] Again, the annotation, which notes the presence of two doorbells next to the Front Door, is Plaintiffs'.



Pls. Supp. Facts ¶¶ 5-6.

The parties dispute the occupants' exact living arrangements.  The parties agree that Santa lived in the first-floor apartment, Cecilia and Kelvi lived on the second floor, and Julian lived in the basement.[7]  Pls. Supp. Facts ¶ 9; Defs. Reply Facts ¶ 9.  But the parties dispute where Elvin lived.  According to Plaintiffs, Elvin lived in a second-floor bedroom near Cecilia and Kelvi.  Pls. Supp. Facts ¶ 5.  Defendants, relying on an internal report containing Julian's statement, counter that Elvin lived in one of three basement bedrooms, and that an unknown tenant occupied the third second-floor bedroom.  Defs. Reply Facts ¶ 5 (citing Defs. Ex. J, D.E. 125-9 at 10)  Kelvi testified that Elvin and Julian lived in a basement bedroom, but that both used the kitchen, bathroom, and living room on the second floor.  Kelvi Dep. 161:23-162:3; At the time of Elvin's death, Julian lived in the basement.  Pls. Supp. Facts ¶ 8.

Whatever the exact living arrangement, police encountered Kelvi in the second-floor kitchen.  To get there, police had to get through the Front Door, to the left of Santa's door:

---

[7] The basement had no kitchen, requiring its occupants to use the second-floor kitchen.



D.E. 122-1 at 175 (Front Door on the left)

### C. Probation Officer ("P.O.") Havens calls Officer Luther about Elvin's missed probation appointments

Officer Luther was a full-time HPD desk officer.   Pls. Facts ¶ 1.   HPD had no written policies governing the duties of a desk officer.  *Id.* ¶ 2.

On May 21, 2015, Elvin was serving one year of probation for resisting arrest and aggravated assault upon an HPD police lieutenant on December 10, 2014.  Defs. Facts. ¶ 18.  P.O. Havens called HPD and informed Officer Luther that Elvin failed to report to probation since April 15, 2015 and requested that HPD conduct a welfare check.  *Id.* ¶ 3.   P.O. Havens told Officer Luther that Elvin had "a schizoaffective disorder," and that HPD was likely "familiar" with Elvin. *Id* ¶ 4; D.E. 122-1 (Luther Dep.[8] 19-24).

According to Officer Luther, Elvin was "familiar" and "known" to HPD for not being "fond" of police and a history of "elevated" "interactions" with police, including an incident in which Elvin lit himself on fire and a separate incident in which Plaintiff fought two officers.  Pls. Facts ¶¶ 8-9; Luther Dep. 20-24.  According to Luther, HPD knew Elvin was "not in a normal frame of mind…doesn't have a normal way of thinking."  Pls. Facts ¶ 9; Luther Dep. 33:9-14.

---

[8] D.E. 122-1 at 12, *et seq.*

Luther called the police dispatcher to relay P.O. Havens' welfare check request.  Luther Dep. 42.
Luther did not inform the dispatcher that Elvin had schizoaffective disorder.  *Id.* ¶ 7.  A dispatch
went out regarding the welfare check.  Defs. Facts ¶ 96.

### D.  HPD Officers respond to the welfare check request and arrive at Elvin's home

In 2015, the HPD performed 252 welfare checks (Exhibit "DD," City's Answers to
Interrogatories, at Response No. 11).  Defs. Facts ¶ 50.  The Officers who responded to the dispatch
here, including Sergeant Molina and Officers Gallorini and Hernandez, all received departmental
training on how to interact with persons with mental illness prior to this incident, and were trained
to "de-escalate" the situation by listening to the emotionally-disturbed person.  Defs. Facts ¶ 51.

### E.  Sergeant Molina arrives first

On May 21, 2015, Sergeant Molina was assigned as Patrol Sergeant and supervising Patrol
Division Officer for the area encompassing the House.  Defs. Facts ¶ 95.  Molina and Cecilia—
who dated until 2012— had been texting that day.  Pls. Facts ¶¶ 29-30; Defs. Resp. Facts ¶ 29.
When Officer Hernandez was dispatched to the House for a welfare check, Molina went as backup.
Pls. Facts ¶ 32.  Molina was aware of Elvin's mental health history and his combative history with
the HPD, and was "concerned about escalation."  *Id.*; Defs. Counter Facts ¶ 52.  Molina also
recalled one of the responding officers advising dispatch and other responding officers to use
caution.  *Id.*

According to Kelvi, the Front Door was typically shut, but unlocked.  Kelvi Dep. 161:17-
22.  Kelvi last looked at the Front Door at about noon or 12:30 p.m. that day and saw it closed.  *Id.*
at 152:9-18.  Between that time and when the Officers arrived about 45 minutes later, Cecilia left
to get food for Elvin.  *Id.* at 152:22-153:8.

Sergeant Molina was first to arrive at the House; he recalled an open Front Door.  Pls. Facts ¶ 34; Defs. Counter Facts ¶ 73.  Molina encountered Santa, whom he believed to be a tenant, on the porch.[9]  Defs. Counter. Facts ¶¶ 64-66 (citing D.E. 125-20 at 20).  Molina—whom Santa characterized as looking "mad"—asked Santa in Spanish if Cecilia was home.  Defs. Counter. Facts ¶ 67.  Santa pointed to the Front Door and said, "I don't live there, I think [Cecilia] went out, that's her house and…she lives upstairs."  Santa Dep. 35-36.  Santa did not tell the police officers they could not enter.  Defs. Counter Facts ¶ 70; Santa Dep. 36:20-22.  Santa could not recall whether the Front Door was open, and never saw officers go through it.  Santa Dep. 36:23-38:3.  In a sworn statement given to a detective on the day of the shooting, however, Santa said that Officers "opened the door and went in."  D.E. 122-1 at 116.  After Santa spoke with Molina, she returned to her apartment, where she remained during the shooting.

### F.    Officer Hernandez arrives shortly after Sergeant Molina

Officer Hernandez also received the dispatch to perform a welfare check on Elvin.[10]  Pls. Facts ¶ 11; D.E. 126-1 ("Hernandez Dep.") 67-68.  Hernandez, who was familiar with Elvin "through family members," "knew [Elvin] was very combative towards police" and had "a mental illness."  Pls. Facts ¶ 12; Hernandez Dep. 71:9-73:13.  Hernandez was also aware of the incidents in which Elvin lit himself on fire and the separate occasion when Elvin assaulted two officers, including Hernandez's Sergeant and Lieutenant.  Id.; Defs Facts ¶ 92.  Officer Dominguez, who knew Elvin to be combative with police, also advised the dispatcher of Elvin's history.  Defs. Facts

---

[9] From the perspective of an observer looking at the House from the street, Santa was standing on the right side of the porch, slightly to the right of the Front Door.

[10] The parties dispute whether dispatch had informed Officer Hernandez that Elvin had failed to respond to his probation officer that day, or for a lengthier period.  Compare Pls. Facts ¶ 11 with Defs. Resp. Facts ¶ 11.  Hernandez himself limited it to "that day."  Hernandez Dep. 67.

¶¶ 99-100.  Officer Gallorini heard the warning about Elvin and also volunteered to assist.  Defs. Facts ¶¶ 101-102.

When Officer Hernandez arrived at the House, Sergeant Molina was already present.  Pls. Facts ¶ 13.  Officer Hernandez entered the House through the Front Door and went up the stairs to the second floor, where Molina was already standing.[11]  Pls. Facts ¶ 16.  Hernandez believed that he and Molina were permitted to enter to speak to Elvin, in part because Kelvi had not told them to leave.  Defs. Counter Facts ¶ 84.

### G.  Officers encounter Kelvi and Elvin

The Officers encountered Kelvi at his bedroom door and asked about Elvin's whereabouts. Pls. Facts ¶ 17; Defs. Counter Facts ¶ 81; Hernandez Dep. 129-130.  As they were speaking, Elvin opened the kitchen door (Pls. Facts ¶ 18):

 

Left: view from kitchen to stairwell and Kelvi's door, "six or seven feet" away (D.E. 126-1 at 324; Kelvi Dep. 129:20-24)

Right: view from top of staircase into kitchen (D.E. 125-20 at 82)

---

[11] There is a dispute as to whether the Front Door was open upon Hernandez's arrival.  *Compare* Pls. Facts ¶ 13 with Defs. Resp. Facts ¶ 13.

From the kitchen, Elvin stated, "What do you guys want? Or what do you guys fucking want?" and "fuck you, I ain't going nowhere, you're going to have to kill me before I kill you."[12] Pls. Facts ¶ 23; Defs. Resp. Facts ¶ 23; Hernandez Dep. 139:14-140:8. Elvin backed further into the kitchen, a small space approximately six by twelve feet. Pls. Facts ¶ 19; Defs. Facts ¶ 137.

The Officers entered the kitchen after Elvin. Sergeant Molina was in the middle of the kitchen, ahead of Officer Hernandez, who was at the kitchen entrance "next to the molding." Defs. Facts ¶ 141. Though Defendants claim that there was no furniture between the Officers and Elvin, Kelvi testified that there was a dining table in the kitchen. Defs. Facts ¶ 138; Kelvi Dep. 49:16-50:7. Elvin yelled at the Officers; at some point during this interaction, Officer Hernandez told Elvin, "You are not under arrest. You are not in trouble, we just want to make sure you are okay. You did not show up at your PO Office." Pls. Facts ¶ 20; Defs. Resp. Facts ¶ 20; Defs. Facts ¶ 140.

Elvin searched through drawers; Officer Hernandez, believing Elvin to be searching for a weapon, warned, "don't go in there, don't go in there." Defs. Facts ¶ 142. Elvin threw various objects, including a whisk. Defs. Facts ¶ 143.

"Only a matter of seconds" passed from the time the Officers entered the kitchen to the moment when Elvin grabbed a meat cleaver from a drawer. Pls. Facts ¶ 24, Defs. Resp. Facts ¶ 24; Defs. Facts ¶¶ 144, 145. According to Defendants, this is when Elvin stated, "I don't know you…you're going to have to kill me" and Officer Hernandez again stated, "you're not under arrest, you're not in trouble." Defs. Facts ¶¶ 147-48. Kelvi heard the Officers tell Elvin to put down the cleaver at least four or five times, and heard Hernandez tell Elvin "they were family."

---

[12] Defendants assert that Elvin said "fuck you, I ain't going nowhere, you're going to have to kill me before I kill you" later in the confrontation, after Officers had entered the kitchen. Defs. Resp. Facts ¶ 25.

Defs. Facts ¶ 155.[13]   Elvin yelled, "I know how this works. Bullet to the head" and similar exclamations.  Defs. Facts ¶¶ 158-59.  During this time, Officer Gallorini had "cammed" his radio to broadcast what was happening.  Defs. Facts ¶ 161.

By this time, Cecilia had returned home.  Defs. Facts ¶ 165.  She and Kelvi were trying to speak with Elvin, and Officer Gallorini was trying to keep them away from the kitchen.  Defs. Facts ¶¶ 165-66, 168.  From his vantage point in his bedroom, Kelvi could see Sergeant Molina and Officer Hernandez with their guns drawn.  Kelvi Dep. 52:14-24.  According to Gallorini, Elvin became further agitated.  Defs. Facts ¶¶ 167.  Gallorini attempted to "corral" Cecilia and Kelvi in the bedroom across the hall from the kitchen.  Defs. Facts ¶ 168.

In the kitchen, the Officers had drawn their guns when Elvin picked up the cleaver, and commanded Elvin to drop it—according to Sergeant Molina, at least 20 to 30 times.  Defs. Resp. Facts ¶¶ 24-26.  Elvin had not dropped the cleaver; he was "rocking back and forth."  Defs. Facts ¶ 172.  Officer Hernandez told Officer Gallorini to call SWAT.  Defs. Facts ¶ 175.  Elvin, who stood a few feet from Sergeant Molina, allegedly lunged at the Officers with the meat cleaver, and the Officers fired their guns at Elvin.  Pls. Facts ¶¶ 26-27[14]; Defs. Facts ¶ 179-180.  According to Cecilia, immediately before the shooting started, she saw Sergeant Molina "signal" by nodding his head.  Cecilia Dep. 118:6-19.  At the moment officers shot Elvin, Cecilia and Kelvi, from their location in Kelvi's room, could see only one or both officers, but not Elvin.  Kelvi Dep. 60:1-21.

Elvin fell to the ground, face down, with the cleaver under his body.  Defs. Facts ¶ 188.  Sergeant Tripodi arrived at the scene shortly thereafter.  Tripodi Dep. 42.  Elvin was still breathing at that time.  *Id.* 43:12-15.  According to Defendants, because Elvin continued to resist the Officers'

---

[13] Plaintiffs deny any familial relation.  Pls. Resp. Facts ¶ 155.
[14] Defendants dispute that Sergeant Molina fired ten rounds.  Defs. Resp. Facts ¶¶ 26-27.

efforts to disarm him and in order to secure the meat cleaver, Elvin was handcuffed.[15]  Defs. Facts

¶¶ 188-92.  Sergeant Molina was taken away from the kitchen and an ambulance was called.  Defs.

Facts ¶¶ 193-96.  They advised the dispatcher that Elvin was unresponsive but breathing.  Defs.

Facts ¶ 195-96.

Officers called for an ambulance at 1:36 p.m., an ambulance arrived at 1:40 p.m., and Elvin

died of his wounds at Hackensack University Medical Center at 2:48 p.m.  Pls. Facts ¶ 28, Defs.

Resp Facts ¶ 28; Defs. Facts ¶¶ 200-02.  The entire encounter, from the moment Officers arrived

to the time they shot Elvin, lasted just a few minutes.  Defs. Facts ¶¶ 87, 181.

The Bergen County Medical Examiner's autopsy confirmed a gunshot to the right side of

the chest, gunshot wounds to the left shoulder and left arm and forearm, gunshot wounds to the

left thigh and leg, and a gunshot wound to the right thigh.  Defs. Facts ¶ 204; D.E. 125-11 (medical

examiner report) at 12.  A toxicology report disclosed lidocaine and ketamine in Elvin's blood.

Defs. Facts ¶ 205.

**H.  This action**

On July 25, 2017, Magistrate Judge Dickson granted Plaintiffs' motion for leave to file an

amended complaint.  D.E. 22.  Plaintiffs filed the First Amended Complaint (D.E. 23, "FAC")

shortly thereafter, which alleged the following Counts:

1. Violations by all Defendants of 42 U.S.C. § 1983 and N.J.S.A. 10:6-1 stemming from the shooting.  FAC 6.
2. "Civil Rights Violation and Common Law Negligence" by Hackensack and HPD alleging improper training, hiring, supervision and/or retention.  FAC 7.
3. Violation by all Defendants of Due Process Rights.  FAC 9.
4. Excessive force against every Defendant in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendment violations.  FAC 10.

---

[15] Plaintiffs counter that Elvin could not have resisted given that he had been shot multiple times and was already on the ground.  Pls. Resp. Facts ¶ 188.  Indeed, Sergeant Tripodi testified that Elvin was "not moving" and "not resisting."  Tripodi Dep. 43:17; 44:17-45:4.  Tripodi removed the handcuffs as soon as medics arrived.  *Id.* 47:17-22.

5. Fourth and Eighth Amendment violations by Sergeant Molina and Officer Hernandez in violation of New Jersey Constitution Article 1, § 7.  FAC 11.

6. "Violation of 42 U.S.C. § 1983" against all Defendants stemming from Defendants' entry into the [House] and shooting Plaintiff and forcing Cecilia and Kelvi in a side room against their will.  FAC 12.

7. Assault against Sergeant Molina and Officer Hernandez.  FAC 13.

8. Violation of 42 U.S.C. § 1983 by all Defendants based on the "improper detention and confinement" of Cecelia and Kelvi in a side room.[16]  FAC 14.

9. Negligent infliction of emotional distress ("Portee") claim by the Estate, Cecilia, and Kelvi against all Defendants.  FAC 15.

10. Intentional infliction of emotional distress by all Defendants against Plaintiffs.  FAC 16.

11. Negligence against all Defendants.  FAC 17.

12. Conspiracy against all Defendants to violate Plaintiffs' civil rights.  FAC 18.

13. Respondeat Superior against Hackensack and HPD based on their employees having acted within the scope of employment.  FAC 19.

14. Negligence against Officer Luther for failing to inform HPD of Elvin's schizoaffective disorder.  FAC 21.

15. A "Fictitious Defendants" count incorporating all prior allegations against unknown officers involved in the subject events.  FAC 22.

On January 14, 2020, Magistrate Judge Dickson denied Plaintiff's motion for leave to file a second amended complaint, which would have added a fifteenth count naming Sergeant Tripodi as a defendant and asserting against him federal and state constitutional violations.  D.E.s 55-56. Thus, the FAC remains the operative pleading.

Plaintiffs seek partial summary judgment determining, as a matter of law, that Sergeant Molina and Officer Hernandez violated Plaintiffs' Fourth Amendment rights by entering the House without a warrant.  Pls. Mot. 5.  Plaintiffs argue that the Officers lacked consent to enter, and that Defendants are not protected by qualified immunity.  Pls. Mot. 7, *et seq.* Defendants jointly cross-move for summary judgment dismissing the FAC, arguing in substance that they had consent to enter and remain in the House, and that Elvin's actions were an unforeseeable, superseding cause of the shooting.

---

[16] It is unclear how this differs from the allegations specific to Kelvi and Cecilia in Count 6.

The parties frame the central issues differently.  Defendants focus on the shooting itself, arguing that it was reasonable, justified, and protected by qualified immunity.  While Plaintiffs do not dispute whether the Officers' shooting of Elvin was reasonable at that exact moment, they urge the Court to look to the Officers' preceding actions.  According to Plaintiffs, the Officers' actions before the shooting—entering the House, to conduct a warrantless, consentless welfare check of an individual known to have schizoaffective disorder and violent interactions with police—must be considered in the context of reasonableness analysis.

## II.    SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A disputed fact is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment.  *Id.*

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Id.* at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. Furthermore, the nonmoving may not simply allege facts, but instead must "identify those facts of record which would contradict the facts identified by the movant." *Port Auth. of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002). The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (1986). When parties file cross-motions for summary judgment, the court must apply the summary judgment standard to each party's motion individually. *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## III. DISCUSSION

### A. Counts I, II, III, IV, V, VI, and VIII: state and federal civil rights claims 42 U.S.C. § 1983 and N.J.S.A. 10:6-1 (the New Jersey Civil Rights Act ("NJCRA"))

Counts One, Two, Three, Four, Five, Six, and Eight allege civil rights violations pursuant to 42 U.S.C. § 1983. Counts One and Two also allege related NJCRA claims. In support of their

summary judgment motion, Defendants argue that Plaintiffs have failed to demonstrate viable civil rights claims because Sergeant Molina and Officer Hernandez did not violate Plaintiff's constitutional rights by entering the House without a warrant, that their use of force was reasonable under the circumstances, and that Sergeant Molina and Officers Hernandez and Luther are entitled to qualified immunity on Plaintiffs' federal claims.  Defs. Mot. Points I-V.

### 1.  *The claims will be considered together as Fourth Amendment claims*

As an initial matter, Plaintiffs allege that Defendants violated multiple federal constitutional amendments: the Fourth barring unlawful search and seizure, the Eighth barring cruel and unusual punishment, and the Fourteenth barring deprivation of life, liberty, or property without due process.  Defendants ask the Court to consider all constitutional claims under a Fourth Amendment analysis.  Defs. Mot. 21.

This request is justified.  The Supreme Court has held that

> *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

*Graham v. Connor,* 490 U.S. 386 (1989); *see also Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 n.2 (2021) ("Whatever the source of law, in analyzing an excessive force claim, a court must determine whether the force was objectively unreasonable in light of the facts and circumstances of each particular case.") (cleaned up).

Moreover, the Supreme Court, reluctant to expand the concept of substantive due process, has established the "more-specific-provision rule."  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 843-44 (1998)). "If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific

provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n. 7 (1997).  Here, Plaintiffs' Fourteenth Amendment substantive due process claim and Eighth Amendment cruel and unusual punishment claim are tied either to the shooting itself—a seizure, as discussed below—or the events shortly before and after it, including the alleged unlawful entry into the House.  All of these claims are best analyzed as Fourth Amendment claims. And finally, the Eighth Amendment applies to the punishment of convicted offenders and does not regulate pre-conviction interactions between the police and the public. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

### 2.   *There are three distinct Fourth Amendment claims*

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  The elements of "a claim for excessive force as an unreasonable seizure under the Fourth Amendment" are: (1) "that a 'seizure' occurred," and (2) that the seizure "was unreasonable."  *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999). Where a plaintiff alleges multiple instances of police misconduct, a reviewing court may not consider the entire course of conduct at once, but rather "the objective reasonableness analysis must be conducted separately for each…seizure that is alleged to be unconstitutional."  *County of Los Angeles v. Mendez*, 581 U.S. 420, 137 S.Ct. 1539, 1547 (2017).

Plaintiffs allege three discernable Fourth Amendment violations: (1) unlawful entry into the House; (2) an excessive force claim stemming from the shooting; and (3) another excessive force/deliberate indifference claim *after* the shooting—in substance, that the Officers handcuffed and restrained Elvin as he bled out instead of rendering medical aid.  Because the parties dispute the extent to which the alleged constitutional violations may be considered together, the Court

begins its analysis there.  Plaintiffs argue that the Officers' unlawful warrantless entry into the House, and all other events preceding the shooting, must be considered together.  Defendants counter that each claim must be analyzed separately.

The Supreme Court recently addressed this issue in *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420 (2017).  In *Mendez*, residents of a wooden shack were shot by county sheriff's deputies during a warrantless search of the property on which the shack was located.  *Id.*  Following a bench trial, the district court found that deputies had probable cause to believe that a wanted parolee was hiding in the shack, but denied qualified immunity and awarded damages for excessive force under the Ninth Circuit's "provocation rule," *id.*, which is essentially what Plaintiffs urge here.  The provocation rule "permit[ted] an excessive force claim under the Fourth Amendment 'where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation.'"  *Id.* at 1546.  Phrased differently, even if a court determines that a forceful seizure is reasonable under *Graham*, the court may nevertheless "ask whether the law enforcement officer violated the Fourth Amendment in some other way in the course of events leading up to the seizure," which would render an otherwise reasonable use of defensive force unreasonable as a matter of law.  *Id.* at 1190-91 (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)).

Rejecting the provocation rule, the Supreme Court clarified the "settled and exclusive framework" for analyzing Fourth Amendment excessive force claims: "[d]etermining whether the force used to effect a particular seizure is reasonable [by balancing] the individual's Fourth Amendment interests against the relevant government interests."  *Id.*  (quoting *Graham*, 490 U.S. at 396).  In such cases, the operative question is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure."  *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-

9 (1985)).  "The reasonableness of the use of force is evaluated under an 'objective' inquiry that pays 'careful attention to the facts and circumstances of each particular case,'" and "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Id.* (quoting *Graham*, 490 U.S. at 396). "Contrary to [the provocation rule], the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." *Id.* at 1547.

"Proper analysis of this proximate cause question require[s] consideration of the 'foreseeability or the scope of the risk created by the predicate conduct,' and require[s] the court to conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 1548-49 (quoting *Paroline v. United States*, 572 U.S. 434 (2014)).  Thus, a plaintiff could still "—*subject to qualified immunity*—generally recover damages that are proximately caused by any Fourth Amendment violation." *Id.* at 1548 (emphasis added) (citing *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (noting that § 1983 "creates a species of tort liability" informed by tort principles regarding "damages and the prerequisites for their recovery.")).  In other words, both parties here are, to some extent, correct.  Plaintiffs are correct that the events can be considered together for reasonableness analysis, but Defendants are correct that each violation must be considered separately for qualified immunity purposes.  The Court begins with the latter.

### 3.  *Qualified immunity*

Qualified immunity shields officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

19

Qualified immunity analysis asks two questions, to be conducted "in the order…most appropriate for the particular case[.]" *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  The first is whether the plaintiff sufficiently alleged the violation of a constitutional right; whether, in other words, there is any wrong to address.  *Curley v. Klem,* 499 F.3d 199, 207 (3d Cir. 2007).

And the second qualified immunity question is whether the right was clearly established at the time of the official's conduct."  *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (cleaned up).  To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).  If "the officer made a reasonable mistake about the legal constraints on his actions," then qualified immunity should protect him from suit.  *Curley*, 499 F.3d at 207.

Defendants bear the burden of proof for a qualified immunity affirmative defense.  *See Goldenbaum v. DeLorenzo*, No. 08-1127, 2010 WL 5139991, at *11 (D.N.J. Dec. 10, 2010).  In deciding qualified immunity questions at the summary judgment phase, a court must view the material facts in the light most favorable to the plaintiff.  *Id.*; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  An officer's actions must be judged from the perspective of an objectively reasonable law enforcement officer under the circumstances, aiming to avoid hindsight.  *Graham,* 490 U.S. at 396.  "[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." *Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007).  However, as discussed in more detail below, denial of summary judgment is nevertheless appropriate where the disputed facts are material to the qualified immunity analysis.  *Giles v. Kearney,* 571 F.3d 318, 327-28 n.4 (3d Cir. 2009).

The Court addresses each alleged violation in chronological order.  The Court finds that Officer Luther is entitled to qualified immunity from suit, but that Sergeant Molina and Officer Hernandez are not.

### a.    *Officer Luther's dispatch call*

After Officer Luther heard from Elvin's probation officer, Luther's dispatch call set the other events in motion.  Plaintiffs allege, in substance, that Luther "was negligent in failing to place pertinent information, *i.e.* Elvin Hernandez's mental condition," into the dispatch system. Pls. Opp'n 61-62.  But as Plaintiffs concede, negligence does not overcome state immunity because "a public employee, although negligent, may still act in good faith."  *Goldenbaum v. DeLorenzo*, No. CIV.A. 08-1127, 2010 WL 5139991, at *12 (D.N.J. Dec. 10, 2010) (citing *Canico v. Hurtado*, 144 N.J. 361, 365 (1996)).  And nothing in the record indicates that Luther's actions were, for federal qualified immunity purposes, objectively unreasonable under the circumstances.

As Defendants argue, while HPD Captain Lloyd recognized that it was "important" for officers responding to a call to be aware that they would be dealing with an emotionally disturbed person, there was no policy requiring it.  D.E. 125-11 ("Lloyd Dep.") 73-75.  And in this instance, there is no dispute that the dispatcher and Officers knew that Elvin was an emotionally disturbed person who had a history with HPD.  Thus, Officer Luther's failure to mention a specific diagnosis could not reasonably have had any impact upon what occurred thereafter. Accordingly, Officer Luther is entitled to immunity and the state and federal claims against him will be dismissed.

### b.    *Sergeant Molina and Officer Hernandez's Entry*

### i.    *The right against warrantless entry without consent in the context of community caretaking was clearly established as of 2010*

Defendants argue that the Officer Defendants are entitled to qualified immunity because "there is no consensus of authority or cases demonstrating that entering the House as they did

violated the Fourth Amendment." Defs. Mot. 75. The Court disagrees, and holds that Plaintiffs'

right against warrantless entry into the House for community caretaking functions was clearly

established as early as the Third Circuit's decision in *Ray v. Twp. of Warren*, 626 F.3d 170 (3d

Cir. 2010).

Until *Ray*, there were conflicting precedents from other Circuits regarding "the question of

whether the community caretaking doctrine could justify a warrantless entry into a home." *Id.* at

177. But after *Ray*—and certainly in 2015, when this incident occurred—there was no reasonable

dispute in this Circuit that officers could not rely on the community caretaking exception to justify

a warrantless search of a home "without a well-recognized exception to the warrant requirement,"

such as consent or exigent circumstances. *Id.* at 174. Thus, whether the Officer Defendants are

entitled to qualified immunity turns on whether there was a constitutional violation.

> ii. *There is an issue of fact as to whether the Officers had consent for their warrantless entry, precluding summary judgment on qualified immunity and justifying denial of Plaintiffs' summary judgment motion*

"One's home is sacrosanct, and unreasonable government intrusion into the home is 'the

chief evil against which the wording of the Fourth Amendment is directed.'" *United States v.*

*Zimmerman,* 277 F.3d 426, 431-432 (3d Cir. 2002) (citing *Payton v. New York,* 445 U.S. 573, 585

(1980)). In general, a warrantless entry into a person's home is unreasonable per se. *United States*

*v. Stabile,* 633 F.3d 219, 230 (3d Cir. 2011) (citation omitted). Exceptions to this rule include

consent or probable cause accompanied by exigent circumstances which justify the intrusion.

*United States v. Coles,* 437 F.3d 361, 365-366 (3d Cir. 2006) (citing *Steagald v. United States,* 451

U.S. 204, 211 (1981)).

Defendants argue that the consent exception applies. Defs Mot. 40. Specifically,

Defendants argue that Sergeant Molina reasonably believed that "a third party he spoke with"

(Santa) "had authority over the premises to grant consent." *Id.* 42.  Santa, according to Defendants, was "standing on the front porch at [the House] near the [Front Door] and [Molina] believed that [Santa] was a tenant." *Id.* 43 (citing Molina Dep. 71:5-13).  And then, Santa "told Sergeant Molina that Cecilia lived upstairs and pointed towards the front door saying, '[Cecilia] lives there." *Id.* 44 (citing Santa Dep. 32-38).

But the record is cloudier than Defendants suggest.  Santa *actually* testified that when Sergeant Molina encountered her on the porch, Santa pointed to the Front Door and said, "I don't live there, I think [Cecilia] went out, that's her house and...she lives upstairs."  Santa Dep. 35-36.  And while consent need not be verbal—acts and gestures may suffice—there is usually a request from police which contextualizes the non-verbal consent.  *See United States v. Sabo*, 724 F.3d 891, 893–94 (7th Cir. 2013) (finding that nonverbal cue of opening door and stepping back was sufficient to demonstrate consent); *United States v. Drayton*, 536 U.S. 194, 199-200 (2002) (holding that defendant consented to a search by "lifting his hands about eight inches from his legs" after being asked "Mind if I check you?"); *United States v. Tyler*, No. 1:19-CR-315, 2021 WL 3929737, at *5 (M.D. Pa. Sept. 2, 2021) ("The problem with the government's argument is that it assumes [the resident's] actions were a response to some sort of request.  But [the detective] never sought...permission to walk inside after her.").

Here, there was no explicit request to enter; in Defendants' own words, Sergeant Molina "merely asked...Santa if Cecilia...was home," not to enter.  Defs. Mot. 44.  Thus, Molina—who had dated Cecilia and was texting with her that day—had reason to believe that Santa did not have authority over what lay beyond the Front Door, did not explicitly ask to enter, and replied to

Santa's ambiguous gesture as an invitation to enter.[17]  Even at this phase, an issue of fact exists with respect to consent.

The issues of fact multiply thereafter.  Defendants argue that the Front Door was open, contextualizing Santa's gesture—that is, that her gesture to an open door was an invitation to enter. Defs. Mot. 48-49.  However, though Santa could not recall at her deposition whether the Front Door was open, she told detectives on the day of the shooting that officers "opened the door and went in." D.E. 122-1 at 116.  According to Kelvi, the Front Door was typically shut, but unlocked. Kelvi Dep. 161:17-22.  Kelvi last looked at the Front Door at about noon or 12:30 p.m. that day and saw it closed.  Kelvi Dep. 152:9-18.  Between that time and when police arrived about 45 minutes later, Cecilia left to get food for Elvin.  Kelvi Dep. 152:22-153:8.

Defendants also argue, however, that there are other indicia that the Officers were permitted to be present in the House.  They argue, for example, that the area past the Front Door was essentially a public space.  Defs. Mot. 48-49.  But whether the area was a public space where officers could be is a fact issue for the jury.  *See Dunham v. Kootenai Cnty.*, 690 F. Supp. 2d 1162, 1171-72 (D. Idaho 2010) (citing *Reid v. Hamby,* 124 F.3d 217 (10th Cir. 1997) (unpublished)).

And to the extent that Defendants argue that Officer Hernandez is entitled to qualified immunity because he entered the House after Sergeant Molina had already entered done so, *i.e.*, that Hernandez's actions were more objectively reasonable, the law was clearly established that Hernandez had an independent duty to assess the lawfulness of his entry, independent of Molina's actions.  *See Smith v. Heath*, 691 F.2d 220, 225 (6th Cir. 1982) (second officer was independently

---

[17] Defendants note that Santa did not move in until 2014, two years after Sergeant Molina and Cecilia stopped dating.  Santa Dep. 8:10-9:2.  But even still, the record suggests that Molina knew that *Cecilia* lived beyond the Front Door, and therefore had at least some reason to believe that Santa did not.

liable for his unlawful entry, "which was not made lawful by the prior unlawful entry of the others."); *O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004) (holding that other officers' "unconstitutional behavior did not relieve" defendant probation officer "of his responsibility to decide for himself whether to violate clearly established constitutional rights by intruding into the office without a warrant or exigent circumstances").

Thus, as of the initial entry of both officers, there is an issue of fact as to: (1) whether, based on the House's layout and Santa's relationship to it, Santa had the apparent authority to grant the Officers consent to enter; (2) whether she actually did consent; (3) whether the Front Door was open; and (4) whether, after Officers had already entered, they had any resident's consent to remain there and proceed further.  The existence of a genuine issue of material fact precludes summary judgment on the basis of qualified immunity. *See Giles,* 571 F.3d at 327-28, n.4 (noting that though "denying summary judgment because a material issue of fact remains on an excessive force claim is improper on a qualified immunity inquiry," denial is nevertheless appropriate where "the disputed facts are material to the qualified immunity analysis.").  These factual disputes are sufficient, together with what follows, to deny Plaintiffs' motion for summary judgment on liability.

Defendants also argue that Kelvi implicitly consented to the Officers' presence there by— like Santa did—pointing to a door (in this case, the kitchen door) and indicating Elvin's location. And Defendants argue that Officer Hernandez's actions must be considered independently of Sergeant Molina's.  In other words, Officer Hernandez's actions must be viewed in light of the facts surrounding *his* arrival and experience at the scene, not those of Sergeant Molina, who spoke with Santa and was the first to enter through the Front Door.  *See Leaeno v. Pistor*, No. CIV. 05-00781, 2007 WL 951745, at *7 (D. Haw. Mar. 28, 2007) ("[A]ny officer who had reason to know

that consent had not been unequivocally given to enter the house is not qualifiedly immune" on a warrantless arrest claim)).

Whether Kelvi could have reasonably consented to the Officers' presence is questionable. *United States v. Roberts*, 888 F. Supp. 2d 1316, 1323 (N.D. Ga. 2012) ("Under these circumstances, the [d]efendant's immediate succumbing to a search and interrogation that had already commenced with [the earlier] unconstitutional entry into his hotel room and coercive interrogation was natural."). But whatever the significance of Kelvi's interaction with the Officers and the events that came before it, a factfinder could reasonably determine that Elvin made it very clear that he did not consent to the Officer's presence. Sergeant Molina himself told detectives on May 27, 2015, a few weeks after the shooting, that in the kitchen shortly before Elvin grabbed the cleaver, Elvin told the Officers, "I don't know you. Leave me alone. I don't want to talk to you." D.E. 126-1 at 253:17-254:8. Thus, there is, at minimum, a genuine issue of fact as to whether Molina *or* Hernandez had the consent of any occupant to be present anywhere in the House's interior after Elvin—in Molina's own words—emphasized his displeasure with the Officers' presence, arguably withdrawing his consent. *See Manzanares v. Higdon*, 575 F.3d 1135, 1143 (10th Cir. 2009) (collecting precedent clearly establishing the right to limit, qualify, or withdraw consent to a warrantless entry).

Accordingly, the Court finds that neither Sergeant Molina nor Officer Hernandez are entitled to summary judgment on qualified immunity relating to their warrantless entry into the House. The same issues of fact justify denial of Plaintiffs' summary judgment motion.

### c.    The shooting

### i.    The right to be free of deadly force has long been established

A "seizure" occurs when an individual is shot by a police officer. *Raso*, 183 F.3d at 288. But whether that seizure is excessive is analyzed under an objective reasonableness standard, *Graham v. Connor*, 490 U.S at 395, which requires a court to focus its analysis on the particular facts presented by the case as confronted by the officer. *Tennessee v. Garner*, 471 U.S. at 8; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015) ("[A] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer."). An officer's use of deadly force is reasonable when "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner,* 471 U.S. at 3.

"It has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others." *Lamont v. New Jersey*, 637 F.3d 177, 185 (3d Cir. 2011) (citing *Garner,* 471 U.S. at 3, 11; *Abraham,* 183 F.3d at 294). Or phrased differently, qualified immunity protects officers who reasonably believed that the person they shot posed a threat.

To defeat immunity here, then, Plaintiffs would have to show, at a minimum: (1) that the Officers' conduct in this case was materially different from the conduct previously encompassed by qualified immunity; (2) there had since emerged either "'controlling authority'" or a "robust 'consensus of cases of persuasive authority,'" that would alter qualified immunity analysis; or (3) as discussed above in the warrantless entry context, a genuine issue of fact material to qualified immunity analysis. *See Plumhoff v. Rickard*, 572 U.S. 765, 779-80 (2014); *Lamont*, 637 F.3d at 185 (holding that a jury, viewed evidence in the light most favorable to the decedent's estate, "may

find that the troopers improperly continued firing after [the decedent] had turned away from them and no longer posed a threat.  In short, the dispute in this case is about the facts, not the law."); *Robertson v. Sullivan*, No. 07-CV-1416, 2010 WL 1930658, at *2 (E.D.N.Y. May 12, 2010) ("[W]here there is a stark factual dispute about what happened, the merits of the a plaintiff's Fourth Amendment claim and the defendant's claim of qualified immunity can both ride on whether the jury believes the plaintiff or the defendant.").

### ii.      *There are numerous issues of fact surrounding the shooting, precluding any finding as a matter of law that there was no constitutional violation*

Excessive force claims are "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*, 490 U.S. at 388.  The operative question in excessive force cases is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Garner*, 471 U.S. at 8.  This is analyzed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. *Mendez*, 137 S. Ct. at 1547.  "Excessive force claims…are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."  *Saucier v. Katz,* 533 U.S. 194, 207 (2001).

The parties dispute the framing of what is "reasonable."  Plaintiffs focus their arguments on the connection of the Fourth Amendment search (warrantless entry) claim to the Fourth Amendment shooting (seizure/excessive force) claim.  The Officer Defendants' initial, unlawful

28

entry Plaintiffs argue, set the stage for what came later because they remained when they could easily have left after they accomplished what they came for—tell Elvin to call his probation officer. Pls. Opp'n 17-18.  Plaintiffs argue that the entire incident beginning with the Officers' entry into the home, should inform what is "reasonable."

Defendants counter that what is "reasonable" should be analyzed at the moment of the shooting—the Officers were protecting themselves from Elvin, who lunged at them with a meat cleaver.  The warrantless entry and shooting, Defendants argue, are analytically distinct.  Under either interpretation, however, summary judgment is inappropriate.

Consider Defendants' preferred interpretation first.  They are correct that where a plaintiff alleges multiple instances of police misconduct—here, the unlawful entry *and* the shooting—a reviewing court generally may not consider the entire course of conduct at once, but rather the objective reasonableness analysis must be conducted separately for each seizure that is alleged to be unconstitutional.  *Mendez*, 137 S. Ct. at 1547 (Alito, J.).  As Justice (then-Judge) Alito, writing for the Third Circuit illustrated over two decades before *Mendez*:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause that would limit the officer's liability.  See *id.* § 440.

*Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995) (cleaned up).

But courts have nevertheless urged caution on summary judgment where victims of deadly force cannot testify, to "ensure that the officer is not taking advantage of the fact that the witness

most likely to contradict his story – the person shot dead – is unable to testify." *See Abraham*, 183 F.3d at 294 (the court must "look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably."); *see also Hinson v. Bias*, 927 F.3d 1103, 1118 (11th Cir. 2019) ("we cannot credit an officer's version of events just because a plaintiff cannot personally rebut it"); *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) ("particular care" required before summary judgment can be granted "where the officer defendant is the only witness left alive to testify"). But there must be *affirmative* evidence, direct or circumstantial, to defeat summary judgment, rather than a mere assertion that a reasonable jury could discredit the opponent's account. *See Est. of Smith v. Marasco*, 318 F.3d 497, 513-14 (3d Cir. 2003).

Here, there is no dispute that Elvin held a cleaver and the Officers instructed him to put it down. But the record is unclear as to precisely what occurred right before the shooting, including Elvin's movements. According to the Officer Defendants, Elvin lunged at them with the cleaver. But Cecilia, who was across the hall from the kitchen in Kelvi's room, did not hear Sergeant Molina give any commands to Elvin, or any response from Elvin. Cecilia Dep. 118:24-122:4. ("Nothing. Spoke nothing."). And after HPD Sergeant Tripodi arrived on the scene, neither Sergeant Molina nor Officer Hernandez said anything about Elvin lunging at them.[18] Tripodi Dep. 46.

Shortly before and at the time that the Officers began shooting, Cecilia and Kelvi, from their vantage point in Kelvi's room, could see only one or both officers, not Elvin. Kelvi Dep. 60:1-21. And right before they began shooting, Cecilia did not see Elvin lunge, but did see Sergeant Molina "signal" by nodding his head. Cecilia Dep. 118:6-19. Viewed in the light most

---

[18] Hernandez only mentioned the "knife," *i.e.* the cleaver.

favorable to Plaintiffs, a jury could conclude based on this testimony that Officers were not at immediate risk when they opened fire.  This discrepancy takes on added significance because Elvin's death means he cannot testify.  The Officers are the only ones still alive to describe what occurred in the kitchen.  Accordingly, even analysis focusing just on the shooting itself requires denial of summary judgment.  *See Abraham*, 183 F.3d at 294 (even assuming no genuine dispute that officer was in front of car driven by decedent, issues of fact remained regarding how fast driver accelerated, whether officer had room to evade car, and whether officer was significantly injured).

Expanding the scope of the inquiry beyond the shooting, as Plaintiffs urge, merely accentuates the record's ambiguities.  To be sure, the inquiry is not whether Elvin's actions were reasonable in response to the Officers' conduct, but rather whether the Officers' responses were reasonable under the circumstances, considering the situation they were facing.  *Fields v. City of Pittsburgh*, 714 F. App'x 137, 142 (3d Cir. 2017).  But even under that framework, "the Supreme Court in *Mendez* left open the possibility that, under the *Graham* test, a court should consider 'unreasonable police conduct prior to the use of force that foreseeably created the need to use it.'" *Id.* (citing *Mendez,* 137 S. Ct. at 1547, n. *); *see also Johnson v. City of Philadelphia*, 837 F.3d 343, 351 (3d Cir. 2016) (declining to decide whether *Graham*'s "totality of the circumstances" test "should account for whether the officer's own reckless or deliberate conduct unreasonably created the need to use deadly force"); *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 114 (2d Cir. 2020) (reversing district court's holding that officers who killed decedent with beanbag shotgun was entitled to qualified immunity because the "officers' unlawful entry..., *if borne out by proven facts*, may affect the balancing of factors bearing on whether the officers' use of force was objectively unreasonable under the circumstances.") (emphasis added).

31

"While there is no precise test for determining when a civilian's intervening acts will constitute a superseding cause of his own injury, relevant considerations include whether the harm actually suffered differs in kind from the harm that would ordinarily have resulted from the officer's initial actions; whether the civilian's intervening acts are a reasonably foreseeable response to the officer's initial actions; whether the civilian's intervening acts are themselves inherently wrongful or illegal; and the culpability of the civilian's intervening acts." *Johnson*, 837 F.3d at 352; *see also Pauly v. White*, 874 F.3d 1197, 1221 (10th Cir. 2017) (considering "an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force").

The Third Circuit has held that "[t]he question of proximate causation...is made straightforward by the exceptional circumstances [of] a sudden, unexpected attack that instantly forced the officer into a defensive fight for his life." *Johnson*, 837 F.3d at 352-53. But the Third Circuit was careful to clarify that *Johnson*

> should not be misread to broadly immunize police officers from Fourth Amendment liability whenever a mentally disturbed person threatens an officer's physical safety. Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual. It may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual. Nor should it be assumed that mentally disturbed persons are so inherently unpredictable that their reactions will always sever the chain of causation between an officer's initial actions and a subsequent use of force. *If a plaintiff produces competent evidence that persons who have certain illnesses or who are under the influence of certain substances are likely to respond to particular police actions in a particular way, that may be sufficient to create a jury issue on causation.*

*Id.* (emphasis added).

The facts in this record create the exact causation issue contemplated by *Johnson*. Plaintiffs have "produce[d] competent evidence" that the Officers knew Elvin to have both schizoaffective

disorder and a history of confrontations with their department.  Yet as Plaintiffs argue, in the short window of time when Cecilia—with whom Sergeant Molina had been texting that day—left the House, Officers nevertheless entered the House, then followed Elvin into a confined space (the kitchen) where there was at least some possibility of a confrontation, only to deliver a message to call his probation officer.  This, coupled with the issue of fact above regarding the events immediately preceding the shooting, is sufficient to preclude summary judgment on qualified immunity and Plaintiffs' excessive force claims.

### d.   Defendants are entitled to summary judgment for post-shooting conduct

Plaintiffs also appear to assert that Defendants' conduct after Sergeant Molina and Officer Hernandez shot Elvin violated the Eighth Amendment's prohibition against cruel and unusual punishment claim or the Fourteen Amendment's guarantee of substantive due process.   Unlike the other claims relating to Sergeant Molina and Officer Hernandez, summary judgment will be granted on this claim.

Viewing the facts in the light most favorable to Plaintiff, Sergeant Tripodi testified that Elvin, after being shot, was not moving, let alone resisting.   See *Giles v. Kearney*, 571 F.3d at 327 (holding that because "reasonable officers dealing with an undisputedly assaultive inmate could disagree as to whether force of the type used...was excessive," the legal conclusion of excessive force "rests on a factual presumption that is inappropriate on summary judgment.").  As an initial matter, even viewing the facts in the light most favorable to the Plaintiffs, neither Sergeant Molina nor Officer Hernandez, the only individual officers remaining as Defendants, were involved in handcuffing Elvin because Sergeant Tripodi "cleared" the room after the shooting.  Tripodi Dep. 45-47.  Plaintiffs' own brief identifies only Officer Gallorini as having restrained Elvin.  Pls. Opp'n 72.

33

But even if the Court considered the actions of the officers directly involved in the post-shooting conduct, the reasonableness of that conduct must be evaluated from the perspective of the officer on the scene.  The record indicates that as Sergeant Tripodi entered the kitchen after the shooting, and before the cleared the room, he learned for the first time about the cleaver because Officer Hernandez was screaming repeatedly that Elvin "had a knife."  Tripodi Dep. 44.  Elvin was laying on his stomach, with his hands and the cleaver underneath him.  *Id.*  43-44.  Thus, Tripodi gave the order to handcuff Elvin because he was "still a threat"; from Tripodi's perspective, Elvin could have "gotten up and stabbed [officers]."  *Id.* 43:24-44:6.  Officer Gallorini restrained Elvin for similar reasons.  Gallorini Dep. 60.

Medical assistance was quickly called, and Sergeant Tripodi took the handcuffs off as soon as the medics arrived four minutes later and assisted them to flip Elvin onto his back.  Tripodi Dep. 47:17-48:17; Defs. Mot. 86-87 (citing Defs. Exhs. R, Y).  Thus, even if this claim were analyzed under substantive due process, there is no conduct in the record—as to this phase of events, at least—which "shocks the conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Smith v. Gransden*, 553 F. App'x 173, 177–78 (3d Cir. 2014) (upholding jury verdict and holding that plaintiff was not entitled to judgment as a matter of law where defendant officer was attempting to control a chaotic crime scene and promptly called for medical assistance which transported shooting victim to hospital within minutes of that officer's arrival); *Easterling v. Perez*, No. CV 16-4463, 2019 WL 316015, at *9 (D.N.J. Jan. 24, 2019) (granting summary judgment to defendant officers where there was no evidence that defendant officers had personal involvement in allegations of intentionally delayed medical treatment or otherwise acted with deliberate indifference), *aff'd sub nom. Easterling v. City of Newark, New Jersey*, 778 F. App'x 80 (3d Cir. 2019); *Sullivan v. Warminster Township*, No. 07-4447, 2010 WL 2164520 (E.D. Pa. May 27,

34

2010) (dismissing claim that police officers had "shot [the decedent] for no reason and that they did not immediately render any medical assistance to him" where the undisputed record showed that the decedent had been shot at 6:47 a.m., an ambulance was called by 6:48 a.m., officers began CPR on the decedent by 6:50 a.m., and the ambulance arrived by 6:55 a.m.); *Grant v. Winik*, 948 F. Supp. 2d 480, 508 (E.D. Pa. 2013) (granting summary judgment to defendants where officer used handcuffs for one to two minutes to secure the scene for emergency medical personnel and removed them and rendered medical assistance after ambulance arrived).

### e.    *Related state tort claims/civil rights violations*

As Plaintiffs argue, the same standard that applies to federal qualified immunity applies to New Jersey's state equivalent, good faith immunity.   N.J.S.A. 59:3-3; *Wildoner v. Borough of Ramsey*, 162 N.J. 375, 387.   Thus, Defendants are entitled to qualified immunity on any post-shooting conduct, but not the warrantless entry or the shooting itself.

### B.  Plaintiffs' municipal liability (*Monell*) claims – Counts II and XIII

Count II of Plaintiffs' FAC alleges a failure to train, supervise or retain claim against Hackensack and the HPD, and Count XIII alleges a *respondeat superior* claim.   Defendants seek summary judgment on Plaintiff's municipal liability/*respondeat superior* claims against Hackensack and HPD.[19]   Defs. Mot. 93.   In opposition, Plaintiffs argue that municipal liability stems from the official policy of not requiring a warrant for welfare checks and the "complete failure to train officers in reference to interacting with emotionally disturbed persons and in reference to welfare checks."   These are policy and failure-to-train claims, respectively.

---

[19] To the extent that Defendants argue that there was no constitutional violation, and therefore no municipal liability, Defs. Mot. 93, the issues of fact discussed above counsel against dismissal on that basis.

"Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (cleaned up).  But policies need not be official; plaintiffs can hold municipalities liable by proving that a customary practice "although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  Whether the plaintiff pursues a policy or custom claim, he or she must allege that "a [city] government's policy or custom ... inflict[ed] the injury" in question.  *Monell*, 436 U.S. at 694.  In other words, "a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850; *see also Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984).

Turning to Plaintiffs' policy claim, Plaintiffs argue that the record contains evidence that HPD had an informal custom that welfare checks/community caretaking did not require warrants. Pls. Opp'n 82.  Plaintiffs are correct.  First, Hackensack's Answers to Plaintiffs' Interrogatories state that a warrant was not obtained because "responding officers were dispatched to conduct a welfare check, not dispatched to arrest Elvin."  D.E. 126-1 at 121, ¶ 9.  Similarly, Officer Hernandez testified that he was trained that warrants were not required for welfare checks, and when such checks were conducted with no answer, the procedure was to speak to the superintendent, then have the Fire Department break down the door.  Hernandez Dep. 18-19. Officer Gallorini confirmed as much.  D.E. 126-1 ("Gallorini Dep.") 18-19.

Defendants attempt to redefine the issue as Plaintiffs "incorrectly arguing that [Hackensack] had a policy of not requiring warrants for welfare checks, but fail to cite to any [authority] that requires a warrant for a welfare check when consent is provided to enter the

premises." Defs. Reply 37.  But this does not refute Plaintiffs' allegation.  And to the extent that Defendants' argument rests on consent, that merely underscores the issues of fact regarding consent that the Court addressed above.  Accordingly, the policy/custom component of Plaintiffs' *Monell* claim survives.

A *Monell* claim may also be premised on a municipality's failure to train, supervise, and discipline its employees.  To plead that claim, a plaintiff "must demonstrate that a city's failure to train its employees 'reflects a deliberate or conscious choice.'"  *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (cleaned up) (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001)).  Deliberate indifference is plausibly pled by showing that "(1) municipal policy makers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (quoting *Doe v. Luzerne County*, 660 F.3d 169, 180 (3d Cir. 2011) (cleaned up)).  In addition, plaintiffs must allege that there is a "direct causal link" between the policy and the constitutional violation that is alleged.  *Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).  Conclusory recitations of *Monell* elements claim are insufficient. *See, e.g.*, *Benjamin v. E. Orange Police Dep't*, 937 F. Supp. 2d 582, 595 (D.N.J. 2013) (dismissing claim against city because plaintiff failed to plead adequate facts demonstrating existence of a relevant policy or custom).

Plaintiffs argue that Sergeant Molina, Officer Hernandez, and Officer Luther were inadequately trained on how to conduct welfare checks and interact with emotionally disturbed persons.  Plaintiffs cites numerous deposition excerpts to support their argument.  Pls. Opp'n 84-86.  But Plaintiffs' excerpts omit important context.  There is ample evidence in the record that

officers received, at the Bergen County Police Academy and at HPD, firearms training, use-of-force guidelines, and regular training modules about interacting with emotionally disturbed persons.  Hernandez Dep. 190-197; Molina Dep. 37-38.  Prior to the shooting, Molina last completed a training module on May 4, 2013 and Hernandez on March 18, 2015.  D.E. 125-15 at 7, 9.

Plaintiffs' lack-of-training argument relating to Officer Luther suffers from a different flaw: even assuming Luther did not receive training on interacting with emotionally disturbed persons, it is unclear what connection that would have to the allegations here because the officers who were actually on the scene not only had training, but were personally familiar with Elvin.  In other words, Plaintiffs have not demonstrated any "plausible nexus" or "affirmative link" between any lack of training and deprivation of constitutional rights.  Accordingly, the portion of Plaintiffs' *Monell* claims (Counts II and XII) pertaining to lack of training will be dismissed.

### C.  Plaintiffs' *respondeat superior* claim (Count XIII) will not be dismissed

FAC Count XIII alleges that Hackensack is vicariously liable for the negligence of Sergeant Molina, Officer Hernandez, and Officer Luther under a *respondeat superior* theory.  This appears to be a state law claim, as a municipality is not liable under 42 U.S.C. § 1983 on a *respondeat superior* theory.  *Carpenter v. Chard*, 492 F. Supp. 3d 321, 332 (D.N.J. 2020).  Defendants move to dismiss this count, explaining that Point Four of its brief demonstrates that Plaintiffs cannot demonstrate the individual Defendants' negligence.  Defs. Mot. 102.

That section, however, relates entirely to qualified immunity, not negligence.  The negligence analysis is limited to a footnote asserting that "Plaintiff's negligence claims must be dismissed as a matter of law."  Defs. Mot. 73 n.2.  The Court therefore declines to dismiss the *respondeat superior* claim.

**D.  Plaintiffs' state improper detention claims (Counts VI and VII) are dismissed**

Defendants also seek summary judgment dismissing Plaintiffs' state law improper detention claims, Counts VI and a portion of Count VII.  Defs. Mot. 71; Defs. Reply 28. Defendants are correct that Officer Hernandez and Sergeant Molina are never specifically named as the Defendants responsible for the restraint. *Id.*  And perhaps for good reason: Plaintiffs concede that Molina was not involved in the restraint, and that Hernandez only "blocked [Cecilia and Kelvi] from going into the kitchen once [Elvin] pulled the [cleaver]"—and thus, after the Officers had drawn their guns.  Pls. Opp'n 65-66.  Accordingly, Plaintiffs' improper detention claims are dismissed.

**E.  Plaintiffs withdraw their conspiracy claim (Count XII).**

Defendants also move for summary judgment dismissing Plaintiffs' conspiracy claim. Defs. Mot. 91.  Plaintiffs consent to dismiss that claim, but do not specify whether they consent to dismissal with or without prejudice.  Pls. Opp'n. 82.  The Court will dismiss the claim because it fails to satisfy the standards for a conspiracy claim pursuant to 42 U.S.C. § 1985.

**F.  Defendants are entitled to summary judgment on Plaintiffs' negligence claim (Counts XI and XIV) based on insufficient evidence that Officer Luther was negligent**

Count XI alleges negligence against all Defendants.  Count XIV alleges negligence specifically against Officer Luther.  Defendants seek summary judgment dismissing all negligence claims against Officer Luther, arguing that Luther had no duty of care and did not cause Plaintiffs' damages.  The Court agrees.

In New Jersey, a negligence claim requires four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages.  *Jersey Cent. Power & Light Co. v. Melcar Util. Co.*, 212 N.J. 576, 594 (2013).  Here, Plaintiffs' argument is that "[t]here could

be no doubt that the police owed a duty to the general public and that Officer Luther had a duty to input" information regarding Elvin's schizoaffective disorder—relayed to Luther by Elvin's probation officer—into the dispatch system.  Pls. Opp'n 95.

But Plaintiffs do not cite any support for the assertion of this duty.  Nor do Plaintiffs explain how Officer Luther's omission caused any of what occurred thereafter, particularly because—as Plaintiffs acknowledge—the record is clear that the responding Officers were aware, at least generally, of Elvin's mental health history; indeed, Plaintiffs use that fact in support of the arguments discussed above.  Pls. Opp'n 97.  To the extent that Plaintiffs argue that the Officers may have acted differently if they were informed specifically that Elvin had schizoaffective disorder, they do not explain how that specific diagnostic information would have impacted the Officers' behavior.  In any event, Luther's actions were too far removed from what ultimately occurred for any causation to be found.  Accordingly, Count XI is dismissed as against Officer Luther, and Count XIV is dismissed in its entirety.

### G.  Negligent Infliction of Emotional Distress claim ("NIED," Count IX)

Defendants seek to dismiss Cecilia and Kelvi's NIED claim, arguing that their emotional distress was not sufficiently severe, and that neither observed Elvin's death.  Defs. Mot. 110-111. The Court declines to dismiss the claims.  Negligent infliction of emotional distress claims, also called bystander liability claims, require four elements: (1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress.  *Portee v. Jaffee*, 84 N.J. 88, 101 (1980).

Defendants are correct that neither Cecilia nor Kelvi witnessed the bullets penetrate Elvin's body.  But Plaintiffs are correct that contemporaneous visual observation is not necessary for an

NIED claim.  For example, in *Mansour v. Leviton Mfg. Co.*, in which a father heard his child's screams after defective cooking equipment spilled hot liquid onto the child, the Appellate Division held that *Portee*'s observation requirement can include hearing.  382 N.J. Super. 594, 601–02 (App. Div. 2006) ("It is inconceivable that we would fail to recognize the claim of a blind parent who was in the room and heard the child's screams as she was being burned, simply because the parent could not see the accident.").

Moreover, a bystander liability claim does not require contemporaneous observation of the moment of impact, but simply a witness to the victim's suffering.  *Mercado v. Transp. of New Jersey*, 176 N.J. Super. 234, 238 (Law. Div. 1980) (mother saw her child lying in the street a "very short time" after a car hit the child) (citing *Portee*, 84 N.J. at 95 ("The trauma of witnessing the agonizing *death* of one's child…") (emphasis added)); *Est. of Rosario v. Paterson Police Dep't*, No. CV 14-5167, 2016 WL 6540447, at *3 (D.N.J. Nov. 3, 2016) (declining to dismiss NIED claim where family was "in the immediate vicinity of the shooting, and at minimum heard the gun shots and saw [decedent] being removed from the home immediately thereafter.").  Here, as discussed above, the record is clear that Cecilia and Kelvi were just feet away when Elvin was shot, unable to intervene, and saw his body shortly thereafter.

Defendants' argument that Kelvi and Cecilia's emotional distress are not severe enough to sustain their NIED claims is similarly unavailing.  But Plaintiffs attach the reports of Cheryl A. Thailer, PhD, who met with both Kelvi and Cecilia.  D.E. 126-1 at 263.  Dr. Thailer diagnosed Post Traumatic Stress Disorder ("PTSD") in Kelvi and noted nightmares, depression, and anxiety stemming from the shooting.  Dr. Thailer also diagnosed Cecilia with PTSD, and likewise noted nightmares and symptoms of depression, including diminished interest in significant activities, fear, difficulty falling asleep, irritability, and difficulty concentrating.  Defendants' reply argues,

without explaining further, that Plaintiffs' submission "lack[s] any objective medical corroboration whatsoever," which is plainly inaccurate. Defs. Reply 39. Accordingly, the Court declines to dismiss Plaintiffs' NIED claim.

### H. Intentional Infliction of Emotional Distress ("IIED," Count X)

Defendants also seek summary judgment dismissing Plaintiffs' IIED claim, this time asserted on behalf of Cecilia, Kelvi, *and* Julian. Defs. Mot. 111. Generally, IIED claims require: (1) intentional and outrageous conduct by the defendant; (2) proximate cause; and (3) severe distress. *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366 (1988). Defendants' cursory arguments on the IIED claims are intertwined with their NIED arguments, and address only the last element, severe distress. Thus, for the same reason that the Court declines to dismiss Plaintiffs' NIED claims, the Court declines to dismiss the IIED claims as to Cecilia and Kelvi.

However, to the extent that Plaintiffs' brief does not address any of the IIED elements as they pertain to Julian, and to the extent that the record does not reveal any support for those claims, his IIED claims are dismissed.

## IV.   CONCLUSION

For the reasons above, Plaintiffs' summary judgment motion is **DENIED**. Defendants' summary judgment motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

- All state and federal claims relating to Defendants' post-shooting conduct are dismissed;
- Count II's failure-to-train *Monell* claim is dismissed, but the policy/custom claim survives;
- All state and federal claims against Officer Luther are dismissed;
- The portion of Count VI alleging an improper detention claim is dismissed;
- Count VIII (improper detention) is dismissed in its entirety;
- Count XII (conspiracy) is dismissed in its entirety;
- Count XI (negligence) is dismissed as against Officer Luther;
- Count XIV (negligence against Luther) is dismissed in its entirety; and
- Julian's Count X (IIED) is dismissed.

An appropriate order accompanies this Opinion.

Dated: December 30, 2022                                          /s/ Evelyn Padin
                                                                 Evelyn Padin, U.S.D.J.